UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

AUG 2 9 2016

~~signature~~
CLERK

| | |
|---|---|
| CHAD DUBOIS,<br><br>               Plaintiff,<br><br>   vs.<br><br>MICHAEL JOE HANVEY, Physician's<br>Assistant, Mike Durfee State Prison, in<br>his individual and official capacities;<br>DR. MELVIN WALLINGA, Chief<br>Physician, Mike Durfee State Prison, in<br>his indidivual and official capacities;<br>and<br>DR. MARY CARPENTER, Employee of<br>South Dakota Department of Health,<br>in her individual and official<br>capacities,<br><br>               Defendants. | 4:15-CV-04134-LLP<br><br><br><br>ORDER GRANTING MOTION<br>FOR SUMMARY JUDGMENT |

## INTRODUCTION

Plaintiff, Chad DuBois, filed this pro se civil rights lawsuit under 42

U.S.C. § 1983. After the Court screened DuBois' complaint pursuant to 28

U.S.C. § 1915A, it ordered that defendants be served. Docket 6. Defendants

now move for summary judgment based on qualified immunity. Docket 24. In

response, DuBois moves to amend his complaint. Docket 31. He also moves the

Court for appointment of counsel, for discovery, and for summary judgment.

Docket 33; Docket 37; Docket 39.  For the following reasons, DuBois' motion to

amend is denied, defendants' motion for summary judgment based on qualified

immunity is granted, and DuBois' remaining motions are denied.

## FACTUAL BACKGROUND

On December 27, 2013, DuBois was seen by Dr. Patrick J. Collison at the Yankton Medical Clinic for a post-op visit following a recent surgery he had on his ear. Docket 25-11.[1] During this visit, DuBois complained that both of his ears were draining and that a tube that was recently put in his left ear had come out. *Id.* at 1. A culture was taken of DuBois' ears. *Id.* at 3. DuBois avers that this was the first time he had a MRSA infection. Docket 55 ¶ 1.

Before DuBois received the results of this culture, he went to the prison medical department to complaint about the drainage from his right ear. Docket 25-13. The nurse told him to take his ear drops, antibiotics, and pain reliever and to return to medical if the symptoms worsened. *Id.* On December 31, 2013, DuBois received the results of his culture. Docket 55 ¶ 2. It showed an infection, and Dr. Collison put him on Bactrim for two weeks. *Id.* ¶¶ 2-3; Docket 25-12 at 1. On January 16, 2014, he finished the antibiotics but was still experiencing ear problems, so he went to sick call. Docket 25-13; Docket 55 ¶ 3. Two weeks later, at his follow up with Dr. Collison, he had no complaints about his right ear. Docket 25-12 at 1. By that time, however, he said his left ear was emitting bloody drainage. *Id.* Dr. Collison's exam revealed

1 Although both plaintiff and defendants provide evidence from before this date concerning DuBois' original ear issues and the subsequent mastoidectomy performed on his right ear and tubes put in both ears, *see* Docket 25-1 – Docket 25-10; Docket 56-1, DuBois' complaint only concerns his MRSA infection and the alleged lack of treatment of that infection. *See* Docket 1. His complaint is not detailed, but his statement of material facts begins on December 27, 2013. Docket 55 ¶ 1. Therefore, the Court only responds to the claims DuBois made in his complaint and will only recite the facts that relate to those claims.

2

that his ears appeared normal without pus or debris, and his hearing was normal. Id.

Around February 7, 2014, DuBois went to sick call, complaining of an earache. Docket 55 ¶ 4. Nurse Courtney Sirovy told him that there was nothing she could do for his earache and there was no provider at the prison that day. Id. DuBois asked to speak to a provider through the Avera eCare system, which he had done before. Id. Sirovy said "Well I am not going to do that." Id. DuBois also avers that Sirovy told him that he came to medical too often and outside of permitted hours. Id.

On February 10, 2014, DuBois went to sick call. Docket 55 ¶ 5. He complained that he had drainage from his ears again. Id. He asked for and received clean sheets because his sheets were covered in the bloody drainage from the previous night. Id. The nurse who gave him the sheets told him that he would see a medical provider, but he did not that day. Id.

Two days later, he returned to medical and asked why he had not seen a provider. Docket 55 ¶ 7. The nurse at medical noted red liquid coming out of DuBois' left ear. Docket 25-13. She ordered DuBois to return to medical before bed, and they would cover his ear in gauze. Id. DuBois did this, and the next morning, when the gauze was removed, there was bloody drainage on the gauze. Id. A supervisor was notified as was Physician's Assistant Michael Hanvey, and Dr. Mel Wallinga ordered a culture of DuBois' left ear. Id.; Docket 25-20. DuBois believes that the reason his ear was wrapped in gauze was

3

because the medical department at the prison did not believe that drainage was coming out of his ear. Docket 55 ¶¶ 7, 8.

The culture showed that DuBois had developed a MRSA infection. *Id.* ¶ 9; Docket 25-15. He was given Bactrim for fourteen days. Docket 55 ¶ 9; Docket 25-15. On February 19, 2014, DuBois complained to medical that his ears were getting worse. Docket 55 ¶ 10. The Nurse said that his ears looked painful, but told him to give the antibiotics time to work. *Id.* On February 26, 2014, DuBois again complained to medical. *Id.* ¶ 11. He told them that he was losing his hearing. *Id.* The nurse did not exam DuBois but told him to wait two days until his appointment with Dr. Wallinga. *Id.* DuBois asked if he could be seen that day but was denied. *Id.*

On February 28, 2014, Dr. Wallinga examined DuBois. Docket 25-15. Dr. Wallinga noted drainage in DuBois' left ear, and DuBois complained that he could not hear with his left ear and that it was occasionally sore. *Id.* Dr. Wallinga scheduled a follow up appointment with Dr. Collison, ordered another culture, and prescribed Bactrim for ten days. *Id.* Dr. Wallinga said that DuBois' hearing would return after the infection was cured. Docket 55 ¶ 12.

Later that night, while he was in his cell, DuBois began to feel sick and dizzy. *Id.* ¶ 13. He could not walk or stand up and he began to vomit. *Id.* Correctional Officers called the Unit Manager who brought DuBois to medical. *Id.* DuBois told these officers that he could not hear. *Id.* At medical, he told the nurse about his symptoms and that he was totally deaf in his left ear. *Id.* The

4

nurse noted that DuBois' left ear was clear, without redness or fluid, and contacted Hanvey to ask him how to proceed. Docket 25-19 at 2. Hanvey ordered that DuBois be kept in the infirmary overnight and monitored in order to avoid dehydration. Docket 55 ¶ 13. In the morning, medical released DuBois back to his cell. Docket 25-19 at 2. DuBois asked to be seen by a doctor, but was denied. Docket 55 ¶ 14.

On March 5, 2014, DuBois saw Dr. Collison. Docket 25-16. DuBois told Dr. Collison that he went deaf five days earlier. *Id.* Dr. Collison prescribed medication and set up a follow-up with an audiologist. *Id.* at 3. On March 10, 2014, DuBois saw Audiologist Jason R. Howe who performed hearing tests on DuBois. Docket 25-17. The audiometric tests showed "moderate high frequency mixed hearing loss in the right ear[,]" and "sensorineural hearing loss in the left ear." *Id.* at 2. DuBois had "[n]o usable hearing [in his] left ear." *Id.* The speech reception test showed 100% word recognition in DuBois' right ear, but the record does not state a recognition rate for his left ear. *Id.* Howe ordered medication and a follow-up exam with an MRI. *Id.* at 3. He recommended an audiology evaluation after DuBois finished the treatment plan. *Id.*

On March 17, 2014, DuBois saw Dr. Collison again. Docket 25-18. DuBois also had an MRI done that day, and the results were "negative for tumor or intracranial abnormality . . . ." *Id.* at 1-2. Dr. Collison ordered that DuBois finish his medication and that his blood be tested. *Id.* at 3. Hanvey reviewed this recommendation and ordered that the medication be dispensed through the medication line at the prison. Docket 25-19.

5

On March 28, 2014, DuBois saw Dr. Wallinga and complained of almost complete loss of hearing in his left ear. Docket 25-14. Dr. Wallinga noted that the hearing loss in DuBois' left ear was from the previous MRSA infection. *Id.* During DuBois' next follow-up with Dr. Collison on April 7, 2014, Dr. Collison noted that DuBois' hearing was unchanged since his previous meeting in which DuBois had no usable hearing in his left ear. Docket 25-21; Docket 25-17 at 2. Dr. Collison assured DuBois that his hearing issues would be resolved with time. Docket 25-21 at 2.

On April 30, 2014, DuBois saw Dr. Daniel W. Todd, an ear, nose, and throat specialist. Docket 25-23. Dr. Todd found that DuBois had conversational hearing and that he did not misunderstand words. *Id.* Dr. Todd recommended DuBois receive a bone-anchored hearing aid (BAHA). *Id.* On June 12, 2014, Dr. Wallinga noted DuBois' decreased hearing in his right ear and almost complete loss of hearing in his left ear. Docket 25-25. On July 9, 2014, Dr. Collison recommended DuBois receive a BAHA. Docket 25-26 at 4. A request for a BAHA was submitted to Dr. Mary Carpenter, but she denied it, stating that "surgical hearing augmentation not medically necessary[.]" Docket 25-42.

On February 18, 2015, DuBois saw Dr. Collison for a follow-up on his hearing loss. Docket 25-30. Dr. Collison found that DuBois' hearing loss was unchanged; he could not hear out of his left ear. *Id.* at 1-2. Dr. Collison recommended that DuBois receive a BAHA or a contralateral routing of signals (CROS) hearing aid. *Id.* at 3. During this appointment, Dr. Collison told DuBois

6

that his hearing loss was permanent. Docket 56-1 at 16. DuBois avers that

when he told Dr. Collison that the prison was not treating his left ear,

Dr. Collison said "that is a clear way to lose [your] hearing by not treating the

earache." *Id.* DuBois told Dr. Collison "that was the way I lost it in the first

place[,]" and Dr. Collison "said 'Ya I know.' " *Id.*

On that same day, DuBois saw the audiologist, Howe. Docket 25-31.

Howe found that DuBois had no usable hearing for his left ear, but normal

hearing for his right ear. *Id.* at 4. He ordered an audiology evaluation in twelve

months to monitor the changes. Id. He also recommended DuBois receive a

BAHA or a CROS hearing aid. *Id.* Dr. Carpenter approved a request for a CROS

hearing aid on February 20, 2015. Docket 25-43. DuBois received his hearing

aids on February 27, 2015. Docket 25-32.[2]

On August 11, 2015, DuBois filed this complaint pursuant to § 1983.

Docket 1. His factual allegations state:

> Inmate contacted medical services with extremely painful MERSA
> [sic] infection. Nursing staff routinely taunted the inmate, claimed
> he was faking, denied him treatment until hearing loss became
> permanent. Treatment was belated and not rendered until infection
> had destroyed all hearing in one ear and partial hearing in the
> other. Requests for available treatment were ignored and then
> denied by physician whose job it was to provide adequate medical
> care. Physicians in charge and the Warden himself failed utterly to
> supervise the acts and omissions of staff and failed to order
> corrective action when apprised of the problems via administrative
> remedies.

---

2 Although both parties presented an abundance of evidence from after this date, DuBois'
complaint does not concern these issues. He complains that defendants showed deliberate
indifference to his MRSA infection which led to total hearing loss in his left ear. His statement
of undisputed material facts ends on February 28, 2014. Docket 55. Issues that arose later,
such as the care he received after his hearing loss, difficulties with his hearing aids, and
further ear infections, are not the subject of this case.

> These facts demonstrate an abuse of discretion on the part of prison staff and administrators, and violate the inmate's right to protection of life and health from administrative action. These facts constitute an intentional denial of needed medical care: and establish deliberate indifference to the medical needs of the inmate.

Docket 1 at 8. In relief, DuBois requests money damages as well as an order that defendants be re-trained and that a qualified doctor periodically evaluate constitutional compliance at the prison. *Id.*

The Court screened DuBois' complaint, dismissing it in part and directing service in part. Docket 6. Defendants requested that discovery be stayed until they filed a motion for summary judgment based on qualified immunity, Docket 21, and the Court granted this motion. Docket 22. On February 17, 2016, defendants moved for summary judgment based on qualified immunity. Docket 24. They argue that they are entitled to qualified immunity because the record shows that they adequately treated DuBois, though it was ultimately unsuccessful, DuBois was uncooperative with prison medical staff, he may have exaggerated his symptoms, and his allegations of malpractice or negligence or his disagreement about treatments are not enough to rise to a violation of the Eighth Amendment. Docket 25.

DuBois moves to amend his complaint. Docket 31. The factual allegations in his proposed amended complaint are the exact same allegations as those in his first complaint. *See* Docket 31-1. DuBois also

8

moves for summary judgment. Docket 37. He does not present an argument why he should be granted summary judgment.

DuBois also opposes defendants' motion for summary judgment. Docket 54. His main argument is that defendants' exhibits do not show every interaction he had with medical staff at the prison. *Id.* He provides a journal that he kept which documents every interaction he had with medical personnel at the prison. Docket 56-1.

## DISCUSSION

### I.    Motion to Amend

DuBois moves to amend his complaint. Docket 31. "A party may amend its pleading once as a matter of course within . . . 21 days after serving it . . . ." Fed. R. Civ. P. 15(a)(1). However, after these 21 days have passed, the party "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Even though leave to amend should be freely given, *id.*, a district court may appropriately deny leave to amend " 'if there are compelling reasons such as . . . futility of the amendment.' " *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 948 (8th Cir. 2012) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709 (8th Cir. 2008)).

Twenty-one days have passed since defendants were served on October 9, 2015, at the latest. *See* Docket 15. Defendants oppose DuBois' motion to amend. Docket 32. Therefore, DuBois seeks the court's leave to amend. Docket 31. DuBois filed a proposed first amended complaint with his motion to amend. Docket 31-1.

9

The Court finds that DuBois' amendment would be futile. DuBois' proposed amended complaint includes the exact same factual allegations as his original complaint. Docket 31-1 at 6. According to DuBois, the main reason for filing his amendment was to add as defendants nurses who saw him at sick call but did not note these interactions in his medical file. Docket 36. As discussed below, the Court grants defendants summary judgment based on qualified immunity because DuBois was provided adequate medical treatment by the prison medical staff, not because of a failure to name the correct defendants. DuBois amended complaint would not alter the Court's analysis or decision. Therefore, his amendment is futile, and his motion to amend is denied.

## II. Defendants' Motion for Summary Judgment

Defendants move for summary judgment based on qualified immunity. Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a

10

genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (citation omitted and quotation marks).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## A.    Qualified Immunity

Defendants argue that they are entitled to summary judgment based on qualified immunity. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. The doctrine of qualified immunity, however, generally shields " 'government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

11

which a reasonable person would have known.' " *Smith v. City of Minneapolis,* 754 F.3d 541, 545 (8th Cir. 2014) (alteration in original) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

To overcome a qualified immunity defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't,* 570 F.3d 984, 988 (8th Cir. 2009). The court may analyze these two factors in either order. *Hutson v. Walker,* 688 F.3d 477, 483 (8th Cir. 2012) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). But "[t]o deny . . . qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor." *Hawkins v. Gage Cty.,* 759 F.3d 951, 956 (8th Cir. 2014).

## C.    Deliberate Indifference to DuBois' Medical Needs

DuBois claims that defendants violated his rights under the Eighth Amendment. "[A] prison official who is deliberately indifferent to the medical needs of a prisoner violates the prisoner's constitutional rights." *Letterman v. Does,* 789 F.3d 856, 861 (8th Cir. 2015). To state an Eighth Amendment claim, plaintiffs must show "a substantial risk of serious harm to the victim," and "that the prison official was deliberately indifferent to that risk of harm . . . ." *Id.* at 861-62 (citing *Gordon v. Frank,* 454 F.3d 858, 862 (8th Cir. 2006)).

12

"The deliberate indifference element has two components: an actor must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.'" *Id.* at 862 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Plaintiffs must first demonstrate that defendants knew of the substantial risk of serious harm to the victim." *Id.* (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)). To show this, plaintiffs do not need to show actual knowledge, the court "can infer knowledge if the risk was obvious." *Id.* It is enough to show that the defendant "had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842).

"The plaintiff must show the official 'knew that their conduct was inappropriate in light of' the risk to the prisoner." *Id.* (quoting Kr*out v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). "Knew" in this context means more than negligence and is "akin to the criminal rule of 'recklessness.'" *Id.* (quoting *Farmer*, 511 U.S. at 839-40). "Generally, the actor manifests deliberate indifference by 'intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.'" *Id.* (quoting *Krout*, 583 F.3d at 567).

## D. Dr. Carpenter

Dr. Carpenter's motion for summary judgment based on qualified immunity is granted. "[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's liability

13

must be based on her own "deliberate indifference or tacit authorization." *Grayson v. Ross*, 454 F.3d 802, 811 (8th Cir. 2006) (quoting *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). Therefore, Dr. Carpenter is only liable for her own conduct.[3]

During the relevant time period, Dr. Carpenter approved all of the requests made on DuBois' behalf. Between February 28 and March 31, 2014, Dr. Carpenter approved requests for follow-ups with Dr. Collison, an MRI of the head and inner ears, a referral to an ENT for hearing loss, and for audiogram and VNG testing. Docket 25-35; Docket 25-36; Docket 25-37; Docket 25-38; Docket 25-39; Docket 25-40. There is nothing in DuBois' medical record that suggests Dr. Carpenter refused any requests made in the pertinent time frame, and DuBois does not claim that such requests were made. DuBois' claims of denial of treatment concern the nurses at sick call, rather than requests made to Dr. Carpenter.

Although Dr. Carpenter originally denied authorization of a BAHA, Docket 25-41, DuBois did not raise a claim concerning this denial in his complaint or his proposed amended complaint, and he did not include it in his statement of undisputed material facts. Therefore, this denial is outside the scope of this case. Because Dr. Carpenter approved all of the requests that are relevant to this case, the Court finds that DuBois does not demonstrate the

---

3 To the extent that DuBois claims that Dr. Carpenter failed to properly train her staff, Dr. Carpenter is shielded by qualified immunity. A prison supervisor may be liable for failing to train subordinates. *See Ambrose v. Young*, 474 F.3d 1070, 1079–80 (8th Cir. 2007). However, DuBois fails to allege anything that may support such a claim, and, as explained below, medical staff did not violate DuBois' Eighth Amendment rights.

14

deprivation of a constitutional right. *See Howard*, 570 F.3d at 988.

Dr. Carpenter's motion for summary judgment based on qualified immunity is granted.

### E.    Hanvey and Dr. Wallinga

Hanvey and Dr. Wallinga's motions for summary judgment based on qualified immunity are granted. Defendants provided evidence which showed that the treatment they provided to DuBois was adequate. In the context of the infection that led to DuBois' hearing loss, defendants responded to DuBois' complaints and provided him with adequate care.

On December 27, 2013, at DuBois' follow-up appointment for his mastoidectomy, he complained that both of his ears were draining. Docket 25-11. Dr. Collins took a culture of DuBois' ears and ordered that he take Augmentin and Ciprodex. *Id* at 3. DuBois states the same facts. Docket 55 ¶ 1. After the results of the culture, Dr. Collison put DuBois back on Bactrim. *Id.* ¶ 2. Two days later, DuBois complained to the prison medical department that his right ear was draining. Docket 25-13. The nurse told him to take his ear drops, antibiotics, and Tylenol. *Id*. She also told him to come back to medical if his symptoms worsened. *Id*. These responses represent constitutionally adequate treatment.

On January 16, 2014, DuBois went to medical and complained of pain in his right ear. *Id*. at 2. At this point, DuBois had finished his antibiotics. Docket 55 ¶ 3. The nurse told him that he could see Dr. Collison in two weeks. *Id*. While the nurse did not instantly respond to DuBois' complaints and provide

15

him medical care, Dr. Collison is a specialist in the best position to provide
DuBois with proper care. This represented adequate care. Supporting this
conclusion is the fact that the problems in DuBois' right ear had cleared up by
the time he saw Dr. Collins. During that appointment, DuBois related that his
right ear felt "good" and he had "no complaints." Docket 52-12 at 1. The
examination of DuBois' ear also showed that both were normal. *Id.*

DuBois avers that at some point after this appointment, he went to
medical to complain about his ears. Docket 55 ¶ 4. He avers that a nurse told
him not to fill out a sick call slip because there was nothing she could do for an
earache and there was no provider at the prison that day. *Id.* He asked the
nurse to let him use the Avera eCare system. *Id.* The nurse allegedly said "I am
not going to do that," and then complained that DuBois came to medical too
often. *Id.*

Once again, while this care is not exactly what DuBois sought, the nurse
was not able to provide the care he sought. Within the week, DuBois was
examined by a nurse. Docket 25-13; Docket 55 ¶ 7.[4] At that time, the medical
staff put gauze over his ear at night, and removed it in the morning in order to
take a culture of the drainage. Docket 25-13. Dr. Wallinga ordered this culture.
Docket 25-20. DuBois avers that the reason the culture was taken was
because defendants did not believe his ears were draining. Docket 55 ¶ 7.
However, it does not matter whether defendants believed his ears were

---

4 DuBois does not state exactly when this interaction took place, but his statement of
undisputed material facts suggests that it was around February 7, 2014.

16

draining; they provided him adequate medical care by collecting and testing the drainage.

According to DuBois, the culture showed that he had a MRSA infection. Docket 55 ¶ 9. He was given Bactrim for his infection. *Id.*; Docket 25-20. When DuBois went to medical two days later complaining that his ears hurt, the nurse told him to give the antibiotics time to work. Docket 55 ¶ 10. Again, DuBois claims that this care was inadequate, but it is reasonable to give the antibiotics time to work. DuBois' issue is more about the medication itself not working fast enough.

On February 26, 2014, DuBois went to medical to complain about his ears. *Id.* ¶ 11. The nurse told him to wait until February 28 because DuBois had a check-up scheduled with Dr. Wallinga. *Id.* Here, Dr. Wallinga is in a better position to provide DuBois adequate care than the nurse. It was reasonable to make DuBois wait.

On February 28, 2014, DuBois saw Dr. Wallinga. Docket 25-15. Dr. Wallinga noted that DuBois' left ear was sore and draining, and he had almost no hearing in his left ear. *Id.* DuBois told him about his hearing loss. Docket 55 ¶ 12. Dr. Wallinga ordered another culture and further Bactrim treatment, and he ordered a follow-up appointment with Dr. Collison. *Id.*; Docket 25-15. DuBois does not complain about the treatment he received on this day.

That night, DuBois went to medical because he could not walk or hear and was vomiting. Docket 55 ¶ 13; Docket 25-19 at 2. The nurse at medical

17

contacted Hanvey who ordered that DuBois stay in the infirmary overnight so that he could be monitored. Docket 25-19 at 2. DuBois told the medical staff that he was completely deaf in one ear. Docket 55 ¶ 13. He complains that in the morning, the medical staff released him back to his cell, even though he told them it was an emergency and he had to see a doctor immediately. *Id.* ¶ 14. He was not seen immediately, but he was provided adequate medical care. He was seen by Dr. Collins on March 5, 2014, and seen by an audiologist five days later. Docket 25-16; Docket 25-17. In the meantime, he was given more Bactrim. Docket 25-20. Whatever complaints DuBois has about his treatment are merely a disagreement in the treatment. This does not represent constitutionally inadequate treatment.

On March 10, 2014, DuBois saw audiologist Howe. Docket 25-17. Howe noted that there was "sensorineural hearing loss in the left ear[,]" and DuBois had no "useable hearing" in his left ear. Docket 25-17. DuBois claims that defendants ignored his MRSA infection "until hearing loss became permanent." Docket 1 at 5. Therefore, everything after March 10, 2014, is outside the scope of this case.

While DuBois complaint states that he was not provided adequate treatment, his medical record shows that his treatment was adequate. Generally, DuBois argues that he was not given the type of treatment he sought and was not treated right away whenever he sought treatment. However, "Prisoners do not have a constitutional right to any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). DuBois' medical file

18

belies the allegation that his constitutional rights were violated. " 'In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel []he received adequate treatment.'" *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)).

DuBois avers that he was denied medical treatment numerous times and that these interactions with the prison medical staff were not documented in his medical record. Defendants argue that these interactions did not occur. These interactions, however, are irrelevant to DuBois' claims. DuBois' medical record shows that defendants provided him with adequate care. Given that, he has not shown that any claimed rebuff caused an injury. As explained above, the record indicates that defendants cared for every one of DuBois' complaints in the relevant time period. Most of DuBois' complaints are that he was not given care immediately after he asked for it. If he sought care on a Monday and was rebuffed, yet was provided care on a Tuesday, or the next day a doctor was available, he was provided constitutionally adequate medical care.

DuBois also alleges that defendants taunted him and claimed that he was faking or exaggerating his illnesses. Defendants argue that this is not in DuBois' medical file, and it therefore did not happen. While defendants' argument is unconvincing, whether DuBois was taunted or disbelieved is not material. These actions would be evidence to support the claim that defendants were deliberately indifferent if DuBois' medical record suggested

19

deliberate indifference. The medical record here, however, clearly shows that defendants provided DuBois with adequate medical treatment. Taunts and disbelief by themselves do not violate the constitution so long as adequate medical treatment was provided. It must be remembered that what amounts to a medical malpractice claim does not under these facts make a claim of a constitutional violation.

Hanvey and Dr. Wallinga provided constitutionally adequate medical care. Therefore, the Court finds that DuBois does not demonstrate the deprivation of a constitutional right. *Howard*, 570 F.3d at 988. Defendants' motion for summary judgment based on qualified immunity is granted. Because the Court grants summary judgment based on qualified immunity to all parties, all of DuBois' motions are dismissed.

Accordingly, it is ORDERED

1. Dubois' motion to amend (Docket 31) is denied.

2. Defendants' motion for summary judgment based on qualified immunity (Docket 24) is granted.

3. DuBois' motion for summary judgment (Docket 39) is denied.

4. DuBois' motion to appoint counsel (Docket 33) is denied as moot.

5. DuBois' motion for discovery (Docket 37) is denied as moot.

6. Defendants' motion to extend (Docket 57) is denied as moot.

Dated August 29, 2016.

BY THE COURT:

Lawrence L. Piersol
UNITED STATES DISTRICT JUDGE